# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

| | | |
|---|---|---|
| AMY NELOMS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:18-cv-00316-DCN-MGB |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| CHARLESTON COUNTY SCHOOL DISTRICT, | ) ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on United States Magistrate Judge Mary Gordon Baker's report and recommendation ("R&R") that the court grant defendant Charleston County School District's ("CCSD") motion for summary judgment, ECF No. 21. For the reasons set forth below, the court adopts the R&R and grants CCSD's motion.

## I. BACKGROUND

The R&R ably recites the salient facts of this case, and it is unnecessary to review the details of the complaint, filings, depositions, and exhibits that constitute the factual record. The court notes the following relevant facts. Plaintiff Amy Neloms ("Neloms") began working for CCSD as a guidance counselor in 2002. In August 2013, Neloms was promoted to Director of Guidance and Counseling Services K-12 for the entire school district. As Director of Guidance, she immediately became responsible for hiring school counselors, leading student programs, and enhancing the guidance program. She was further tasked with numerous responsibilities including managing the multimillion-dollar federal "Gear Up" grant, undertaking sole responsibility for managing the District's Crisis Intervention Plan and Team, answering complaints from the District's Bully

1

Prevention Hotline, managing and compiling content for the District's "Program of Studies" database, activating all of CCSD's high school courses in a program called "Power School", administering a scholarship program for the District, serving as a test coordinator for the Preliminary Scholastic Aptitude Test, coordinating the District's child sexual assault training, overseeing bus driver training sessions on bullying prevention, managing any incoming petitions for high school diplomas, creating a performance evaluation system for school counselors, and overseeing District-wide implementation of a software system called "Naviance." ECF No. 21 at 2–3. Neloms claims she was not given sufficient training to perform these duties and asked for help throughout the fall of 2015, especially with regard to the administration and audit of the Gear Up grant. In response to this, CCSD hired Chameeka Smith ("Smith") in September 2015 to aid in the internal audit of the grant.

On September 30, 2015, the Post & Courier published an article revealing that CCSD faced an $18 million shortfall. Then, on November 25, 2015, the Post & Courier published a follow-up article identifying specific instances of overspending, including $841,000 in the Guidance Department. The article did not name Neloms as being involved in the shortcoming, but Neloms felt that it implicated her as the current Director of Guidance, despite the fact that Neloms was not the Director of Guidance at the time of the overspending. As a result, she asked the District Superintendent and Legal Department to contact the Post & Courier to clarify the article. They declined to do so.

Smith resigned as project manager of the Gear Up grant in July 2016. The effect of Smith's resignation on Neloms's workload and responsibilities caused Neloms a great deal of stress such that she broke down in tears in a meeting with her supervisor,

Michelle English-Watson ("English-Watson"), and the Gear Up grant auditors. On August 5, 2016, English-Watson hired Cindy Smalls ("Smalls") as a temporary employee to assist in the organization of the Gear Up audit documents; her role ended in January 2017. In September 2016, CCSD hired Donna Newton ("Newton") as Neloms's secretary. Then in October 2016, Dennis Muhammed ("Muhammed") was hired to permanently replace Smith as the project manager for the Gear Up grant.

During December 2016 and January 2017, Neloms experienced significant stress with regard to her job such that on February 16, 2017, Neloms's physician submitted forms indicating that Neloms was suffering from anxiety, sadness, and decreased motivation and needed to take two weeks of leave under the Family and Medical Leave Act ("FMLA"). In response, English-Watson sent Neloms an email affirming the FMLA leave but requesting that Neloms put together a list of current projects for the purpose of making sure the office did not fall behind on its assignments. Neloms replied, providing the list. Originally, Neloms's fulltime FMLA leave was scheduled until February 27, 2017, but it was later extended to last until March 28, 2017. When her FMLA leave expired, Neloms returned to work with a modified, intermittent leave schedule such that she would work four hours per day, as opposed to eight hours per day.

By this time, the internal audit of the Gear Up grant was complete and the code-of-conduct work was reassigned to the Curriculum Instructions Department. However, Neloms claims that she had to work more than four hours a day because she was still expected to complete the same amount of work that she previously had. In other words, while her number of hours decreased, her workload did not. Though Neloms claims she had to sometimes work at home—exceeding her four-hour limit—to keep up with certain

responsibilities, she also acknowledges that no one directed her to do this. Neloms remained overwhelmed by her number of responsibilities and asked English-Watson to reassign them to other departments or hire her more staff. She also asked that some of her core job duties be temporarily reassigned to accommodate the four-hour work day. English-Watson explained to Neloms that if something is in Neloms's job description, then Nelom had to do it. Because their dialogue eventually broke down, both parties agreed that Neloms should contact Employee Relations. From April 18, 2017 onwards, Neloms was in conversation with Employee Relations to clarify her job responsibilities. Neloms met with members of the Employee Relations department on two separate occasions: on or around April 26, 2017 and on May 8, 2017. Then on May 16, 2017, Neloms requested and was approved for full time FMLA leave, and on June 6, 2017, Neloms submitted a resignation letter while still on FMLA leave. Her resignation was accepted shortly thereafter and she was allowed to remain on FMLA leave until June 30, 2017.

Neloms filed suit in the Court of Common Pleas for the Ninth Judicial Circuit in the county of Charleston, South Carolina on December 8, 2017. She brought causes of action for: (1) denial of reasonable accommodations pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 705; (2) interference/retaliation in violation of the FMLA; and (3) defamation by innuendo. CCSD removed the complaint to federal court on February 5, 2018 and filed a motion for summary judgment on January 4, 2019, ECF No. 18. Neloms responded to the motion on January 17, 2019, ECF No. 19, and CCSD replied on January 22, 2019, ECF No. 20. On June 19, 2019, Magistrate Judge Baker issued an R&R recommending that CCSD's motion be granted. ECF No. 21. Neloms

filed objections to the R&R on July 3, 2019, ECF No. 22, and CCSD replied on July 8, 2019, ECF No. 23.

## II. STANDARD

### A. R&R

The magistrate judge makes only a recommendation to the court. Mathews v. Weber, 423 U.S. 261, 270 (1976). The recommendation carries no presumptive weight, and the responsibility to make a final determination remains with the court. Id. at 270–71. The court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge . . . or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1). The court is charged with making a de novo determination of any portion of the R&R to which a specific objection is made. Id.

### B. Summary Judgment

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, 'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). Any reasonable inferences are to be drawn in favor of the nonmoving party. See Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012). However, to defeat summary judgment, the nonmoving party must identify

an error of law or a genuine issue of disputed material fact. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); see also Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).

Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. See Anderson, 477 U.S. at 252; Stone, 105 F.3d at 191. Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the factfinder could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id. (quoting Anderson, 477 U.S. at 248).

### III.  DISCUSSION

Neloms raises three objections to the R&R. Neloms argues that the R&R erred in: (1) finding as a matter of law that CCSD provided timely reasonable accommodations in accordance the Rehabilitation Act; (2) finding that there was no actionable interference with Neloms's FMLA leave; and (3) finding that CCSD's failure to correct a false statement did not imply that Neloms was responsible for the budgetary shortfall in her department. The court addresses each in turn.

#### A. CCSD's Accommodations

First, Neloms argues that the R&R erred in finding as a matter of law that CCSD provided Neloms with a timely reasonable accommodation. Failure-to-accommodate

6

claims brought under Section 504 of the Rehabilitation Act use the same standards as applied to Title I of the Americans with Disabilities Act of 1990 ("ADA"). 29 U.S.C. § 794(d). Establishing a prima facie case for failure to accommodate under the ADA requires a plaintiff to show "(1) that she was an individual who had a disability within the meaning of the statute; (2) the employer had notice of her disability; (3) she could perform the essential functions of her position with reasonable accommodations; and (4) the employer refused to make such accommodations." Wilson v. Dollar Gen. Corp., 717 F.3d 337, 345 (4th Cir. 2013). "Implicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." Haneke v. Mid-Atl. Capital Mgmt., 131 F. App'x 399, 400 (4th Cir. 2005).

      Neloms argues both that CCSD failed to provide reasonable accommodations and that CCSD's efforts to accommodate Neloms were not timely. Neloms also goes on to explain that she objects to the R&R's finding that Neloms ended the interactive process by resigning, making Neloms unable to prove her prima facie case.

      Neloms first contends that the Magistrate Judge erred in finding that CCSD provided Neloms with reasonable accommodations. This finding relates to the fourth prong of a failure-to-accommodate claim—whether the employer refused to make reasonable accommodations. The R&R found that CCSD did provide Neloms with reasonable accommodations, explaining why each of the accommodations was reasonable. Neloms specifically cites to the following facts to show that a jury could find that CCSD did not provide Neloms with reasonable accommodations: (1) the Gear Up grant management and audit was previously managed by several people and CCSD only

hired two staff members to aid Neloms; (2) Neloms was denied grant management training until the federal government threatened to cancel the Grant unless she was properly trained, after which she was given the training; (3) while Neloms was trying to manage the grant without training, she also had to switch over grading scales which added difficulty to the process; (4) Small, who was hired to help with the grant, was only hired for three months; (5) Neloms requested that she be provided an operational coordinator but was provided a secretary, a less qualified individual; and (6) Neloms was the sole overseer of the District's Crisis Management Team and would be required to stop all work for up to three days whenever a crisis arose. Neloms also contends that she specifically requested that CCSD return some of the Crisis Team responsibilities to other CCSD employees and that the responsibilities for CCSD's Program of Studies and PowerSchool data system be shifted back to other CCSD employees, and that CCSD denied these requests. As such, she concludes, a jury could find that CCSD did not reasonably accommodate Neloms.

Neloms misses an important point when arguing about these facts, and it is due in part to the unique factual scenario of this case. Most of Neloms's requests for help or changes in her workload occurred <u>before</u> Neloms notified CCSD of her disability. One of the elements of a failure-to-accommodate claim is that the employer had notice of the plaintiff's disability. <u>Wilson</u>, 717 F.3d at 345. The record shows that CCSD was not aware of Neloms's disability until, at the earliest, Neloms emailed Jermaina Nelson on February 15, 2017 requesting that FMLA forms be sent to her doctor. ECF No. 18-6 at

2.[1] Yet most of the accommodations that Neloms found to be inadequate, such as hiring two staff members to help her or failing to provide grant training, occurred before CCSD knew of Neloms's disability. Therefore, those accommodations were not in response to Neloms communicating a need for accommodations as a result of her disability, and whether those accommodations were reasonable is not relevant here.

Instead, the court must focus its inquiry on whether CCSD failed to provide reasonable accommodations for Neloms once CCSD learned of her disability. While the R&R focused on whether CCSD's accommodations were reasonable in considering whether CCSD refused to make reasonable accommodations, the court need not consider whether the accommodations were reasonable because CCSD had not yet actually refused to make accommodations. Neloms made several requests for accommodations after CCSD had notice of her disability. For example, in Neloms's April 6, 2017 meeting with English-Watson, Neloms requested that CCSD shift responsibilities related to Naviance and the Program of Studies to other CCSD employees, ECF No. 19-1, Neloms Depo. 134:24–135:13. Neloms also requested additional support in handling her Crisis Team responsibilities. However, and crucially, there is nothing in the record to show that CCSD refused to accommodate Neloms during the relevant time period.

In her objections, Neloms claims that CCSD did not grant her request to return some of the Crisis Team responsibilities to other CCSD employees but does not provide a citation to the record to show that CCSD did deny that request. In fact, Neloms

---

[1] To be sure, Neloms alleges in her complaint that by August of 2016, she starting receiving treatment for depression and that English-Watson "reported to the District's Superintendent that [Neloms] had left a meeting in tears[,]" Compl. ¶ 22, but there is no evidence to suggest that CCSD knew of Neloms's depression diagnosis.

acknowledged in the April 6, 2017 meeting with English-Watson that CCSD was in the process of hiring a co-leader to assist Neloms with her Crisis Team responsibilities. ECF No. 19-8 at 2:2–3:6. Neloms also claims that CCSD denied her request to shift responsibilities for the Program of Studies and PowerSchool data system back to other CCSD employees, but her citations to the record only explain that Neloms made the request, not that the request was denied. See ECF No. 19-4 ¶ 12; Neloms Depo. 134:24–135:17. As such, Neloms has failed to show that CCSD refused to accommodate her after CCSD knew of her disability.

To be sure, according to Neloms, English-Watson told her during their April 6, 2017 meeting that "if it's in [your] job description, [you've] got to do it," Neloms Depo. 121:7–10, but Neloms also said that both she and English-Watson suggested that they figure out the issues with Employee Relations because "the conversation was going nowhere," id. at 120:20–121:1. Even drawing inferences in favor of Neloms, English-Watson's comment that Neloms had to complete the duties in her job description is not a refusal to accommodate Neloms because no resolution was reached in the meeting and both parties clearly contemplated continuing a conversation about reducing Neloms's workload. As such, the court finds that, even viewing the evidence in the light most favorable to Neloms, Neloms cannot demonstrate that CCSD refused to accommodate her.

Relatedly, Neloms next objects to the Magistrate Judge's finding that CCSD "was in the process of negotiating even further accommodations." ECF No. 22 at 11 (quoting ECF No. 21 at 16). Neloms contends that "[w]hether [CCSD]'s efforts to accommodate [Neloms] were timely is a material issue of fact." Id. Neloms then goes on to argue that

a jury could find that CCSD did not accommodate Neloms in a timely manner, and as such, a jury could find that CCSD engaged in the interactive process in bad faith.

"The duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability." Wilson, 717 F.3d at 346–47. "Once an employer's responsibility to provide a reasonable accommodation is triggered, it may be necessary for the employer to engage in an 'interactive process' to determine the appropriate accommodation under the circumstances." Crabill v. Charlotte Mecklenburg Bd. of Educ., 423 F. App'x 314, 322 (4th Cir. 2011). In determining whether an employer and an employee engage in such a process in good faith, "[n]o hard and fast rule will suffice, because neither party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability." Id. (quoting Beck v. Univ. of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135–36 (7th Cir. 1996)). Instead, the Fourth Circuit has explained that "courts should look for signs of failure to participate in good faith[,]" such as "[a] party that obstructs or delays the interactive process" or "[a] party that fails to communicate, by way of initiation or response." Id. (quoting Beck, 75 F.3d at 1135–36). Importantly, "an employee cannot base a reasonable accommodation claim solely on the allegation that the employer failed to engage in an interactive process," but "[r]ather, the employee must demonstrate that the employer's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee." Id. at 323.

In a similar vein, "[a]n employer's liability for failure to provide a reasonable accommodation ensues only where the employer bears responsibility for the breakdown

in such communications." Allen v. City of Raleigh, 140 F. Supp. 3d 470, 490 (E.D.N.C. 2015). The Fourth Circuit has not explicitly spoken on this issue, but "[t]he First, Fifth, and Seventh Circuits have held an employer cannot be liable under the ADA if the employee breaks down the interactive process." Clark v. Sch. Dist. Five of Lexington & Richland Ctys., 247 F. Supp. 3d 734, 745 (D.S.C. 2017); see also Maubach v. City of Fairfax, WL 2018552, at *5 (E.D. Va. Apr. 30, 2018) (explaining that "the Fourth Circuit has not issued a published opinion addressing the obligation of an employee—as opposed to an employer—to engage in the interactive process" but that "the Fourth Circuit's unpublished Crabill decision and multiple circuit courts in published opinions have held that an employer cannot be held liable under the ADA where it is the employee who refuses to engage in, or who causes the breakdown of, the requisite interactive process to determine a reasonable accommodation.").

Neloms argues that CCSD abandoned the interactive process in bad faith because (1) English-Watson testified that she had no conversations about making an accommodation for Neloms when Neloms returned to work on intermittent leave, (2) English-Watson did not know if there was a protocol for handling an employee returning from FMLA leave and may still need accommodation, (3) English-Watson still expected Neloms to perform all of her full-time job duties while working four hours per day, and (4) CCSD had not yet approached Neloms's supervisors about providing reasonable accommodation six weeks after Neloms returned to work. Neloms then concludes that "[t]he Magistrate erred by blaming Plaintiff for ending an interactive process that had arguably not even begun . . . ." ECF No. 22 at 12.

With regard to Neloms's first argument, CCSD's duty to engage in the interactive process did not begin until CCSD knew of Neloms's disability and Neloms first requested an accommodation in her meeting with English-Watson on April 6, 2017. This happened after Neloms returned to work on intermittent leave. Therefore, English-Watson's failure to discuss accommodations for Neloms prior to her returning to work on intermittent leave is irrelevant to the interactive process. Similarly, English-Watson's lack of knowledge about FMLA protocol does not mean that CCSD was not engaging in the interactive process in good faith. The fact that English-Watson and Neloms agreed, after a failed conversation, that it would be best for Neloms to meet with Employee Relations indicates that English-Watson recognized her inability to help Neloms and was making efforts to ensure that Neloms received the accommodations she needed. Finally, the fact that English-Watson expected Neloms to perform her job duties within a four-hour day is not an instance of English-Watson obstructing the interactive process or failing to communicate during the process. There is nothing to suggest that English-Watson's expectation caused any breakdown in the interactive process.

With regard to CCSD's failure to approach Neloms's supervisor, Neloms explains that CCSD "admitted it began considering an accommodation on April 6, 2017 but stopped working towards making an accommodation when Neloms resigned two (2) months later on June 6, 2017." ECF No. 22 at 12. Neloms then notes that "[i]mportantly, therefore, as of June 6, 2017, six (6) weeks after [Neloms] had returned to work, [CCSD] had not yet approached [Neloms]'s supervisors about providing a reasonable accommodation." Id. As such, Neloms argues that "a jury could certainly find [CCSD]'s decision to wait six (6) weeks before discussing a possible accommodation with

[Neloms]'s supervisors was evidence of bad faith and evidence of failure to engage in the interactive process." Id.

As an initial matter, the court is unsure how Neloms arrived at a time period of six weeks. Neloms returned to work on March 28, 2017 and resigned on June 6, 2017, which is a little over two months, not six weeks. Moreover, it is the request for accommodation that triggers the interactive process, not Neloms's return to work, and Neloms's first request, once CCSD was aware of her disability, took place in her April 6, 2017 meeting with English-Watson. Therefore, the interactive process took place between April 6, 2017 and June 6, 2017.

The question then becomes whether CCSD's failure to approach Neloms's supervisor in this time period creates a material issue of fact as to whether CCSD engaged in bad faith in the interactive process. Neloms's argument on this issue is based on an Employee Relations case closure form dated August 30, 2017. That form states that "Neloms first complained about the scope of her job being too broad and demanding. [Employee Relations] worked with her to create a division between original and added duties along with estimated time required." ECF No. 18-21 at 2. The form concludes by stating that "[b]efore an approach to supervisor could be worked out, Neloms resigned on 6/6/17." Id.

First, in arguing that CCSD failed to approach Neloms's supervisor, Neloms fails to consider the fact that Neloms did initially meet with her supervisor, English-Watson, when she first made her request for accommodations in April. Moreover, the Employee Relations form appears to suggest that as a result of the meetings with Neloms, Employee Relations was going to reach out to Neloms's supervisor. The last meeting between

Employee Relations and Neloms took place on May 8, 2017, which was a little less than a month before Neloms resigned. Therefore, it was not six weeks during which Employee Relations failed to contact Neloms's supervisor but about one month, likely due to the fact that Neloms went back on full-time FMLA leave on May 16, 2017.

Regardless of the facts above, Neloms's argument fails because she cannot demonstrate that the cause of CCSD's failure to identify accommodations was CCSD's lack of contact with Neloms's supervisor. In order to succeed in showing that CCSD failed to engage in an interactive process, Neloms "must demonstrate that [CCSD]'s failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee." Crabill, 423 F. App'x at 323. But as discussed above, and as evidenced by the Employee Relations form, the cause of CCSD's failure to identify an appropriate accommodation for Neloms was Neloms's resignation. All of the evidence before the court indicates that CCSD was in the process of identifying accommodations for Neloms when she resigned, and there is simply no evidence to suggest bad faith on the part of CCSD.

Moreover, there are several issues with Neloms's objection that "[t]he Magistrate erred by blaming Plaintiff for ending an interactive process that had arguably not even begun." ECF No. 22 at 12. First, it is not arguable whether the interactive process began. The law is clear that "[t]he duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability." Wilson, 717 F.3d at 346–47. Neloms communicated her desire for accommodations in the April

6, 2017 meeting with English-Watson. That is the point at which the interactive process began.

It is clear that it was Neloms who ended this interactive process by resigning. The First Circuit considered similar facts in EEOC v. Kohl's Dept. Stores, Inc. and found that the employee's resignation from her job was not good-faith participation in the interactive process. 774 F.3d 127, 133 (1st Cir. 2014). In EEOC, the employee suffered from diabetes and requested steady, midday shifts as an accommodation, as opposed to various shifts at different times during the day. Id. at 130. Her supervisor met with her and explained that she spoke with the "higher-ups" at the corporate management level and that she could not provide the consistently steady schedule that the employee requested. The employee became angry and left the meeting. Her supervisor followed her and offered to discuss other potential accommodations, but the employee resigned. Id. at 131. The First Circuit held that the employee's refusal to participate in further discussions with her employer "was not a good-faith effort to participate in an interactive process" and as such, the employee could not succeed on her failure-to-accommodate claim. Id. at 133.

Here, Neloms had three meetings with CCSD to discuss accommodations—one with English-Watson and two with the Employment Relations department. However, instead of continuing those discussion, Neloms resigned from her position. By resigning, Neloms in effect refused to continue discussions with CCSD about finding reasonable accommodations, and as such, she ended the interactive process. Therefore, CCSD

cannot be liable because Neloms was the party who caused the breakdown in the interactive process.

In conclusion, there is no genuine issue of material fact as to whether CCSD refused to accommodate Neloms. During the relevant time period, there is no evidence that CCSD had refused any of Neloms's requests for accommodations, and it was Neloms, not CCSD, who ended the interactive process. As such, summary judgment in favor of CCSD is warranted on this claim.

### B. Actionable Interference Under the FMLA

Neloms next objects to the R&R's finding that there was no actionable interference with Neloms's FMLA leave. "To make out an 'interference' claim under the FMLA, an employee must thus demonstrate that (1) he is entitled to an FMLA benefit; (2) his employer interfered with the provision of that benefit; and (3) that interference caused harm." Adams v. Anne Arundel Cty. Pub. Sch., 789 F.3d 422, 427 (4th Cir. 2015). In addition, a plaintiff must show that she was prejudiced by the interference. See Vannoy v. Fed. Reserve Bank of Richmond, 827 F.3d 296, 302 (4th Cir. 2016) ("The FMLA provides no relief unless the employee has been prejudiced by the violation."). Neloms contends that the only element in dispute is the fourth element—whether CCSD denied Neloms the FMLA benefits to which she was entitled and whether she was prejudiced by this denial. Neloms argues that the R&R "erred in concluding as a matter of law that requiring an employee to perform an eight (8) hours job in four (4) hours was not interference." ECF No. 22 at 15. However, even if there were a question of material fact as to whether performance of an eight-hour job in a four-hour work day constituted a

denial of FMLA benefits, Neloms is still unable to show that she was prejudiced by that denial.

To be granted relief on an FMLA claim, a plaintiff must show she suffered prejudice as a result of her employer's actions since "'the FMLA's comprehensive remedial mechanism' grants no relief absent a showing that the violation prejudiced [the plaintiff]". Vannoy, 827 F.3d at 302 (citing Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002)). Prejudice is established by the plaintiff showing that she lost compensation or benefits, sustained some other monetary loss, or lost employment status as a result of the FMLA interference. Ragsdale, 535 U.S. at 89; see also Ranade v. BT Americas, Inc., 581 F. App'x 182, 185 (4th Cir. 2014) (finding lack of prejudice in the plaintiff's FMLA interference claim because the plaintiff did "not claim that she lost any compensation or benefits, sustained other monetary loss, or suffered loss in employment status as a result of the purported interference").

Here, Neloms has not presented any evidence that she was prejudiced. Neloms does not allege that she was not paid in full for the time she worked, that she was denied benefits, or that she sustained some other monetary loss. Neloms does claim that she "was prejudiced by having to resign her employment due to her worsening health," ECF No. 22 at 15, suggesting that she was constructively discharged. However, the R&R thoroughly considered and rejected that argument, ECF No. 21 at 16–18, and Neloms does not object to the R&R's finding that Neloms was not constructively discharged. For these reasons, Neloms has failed to show that she was prejudiced by any alleged denial of FMLA benefits, and summary judgment in favor of CCSD is warranted as to Neloms's FMLA claim.

### C. Defamation

Neloms objects to the Magistrate Judge's finding that her defamation claim fails. Neloms claims she was defamed when the Post and Courier published an article which revealed CCSD's budget was running a financial deficit due to overspending, in part because of an excessive $841,000 spent by the Guidance Department. Neloms believes this defamed her by implying that she, as the director of the CCSD's Guidance Department at the time the article was published, was responsible for the deficit when in reality she was not the Department head at the time the deficit occurred.

The R&R concluded that the claim fails both because it fails on the merits and because the statute of limitations has expired. Neloms's objection is solely based on the merits of the claim and does not address the expiration of the statute of limitations. For defamation claims, "[t]he limitations period begins when the alleged defamatory statement is made," Harris v. Tietex Int'l Ltd., 790 S.E.2d 411, 416 (S.C. Ct. App. 2016), and South Carolina defamation has a statute of limitations of two years, S.C. Code Ann. § 15-3-550. The allegedly defamatory article was published on November 23, 2015, and Neloms filed her defamation claim two years and fifteen days later on December 8, 2017. Therefore, because the statute of limitations expired, the claim is time-barred, and the court grants summary judgment in favor of CCSD on Neloms's defamation claim.

## IV. CONCLUSION

For the foregoing reasons the court **ADOPTS** the R&R and **GRANTS** CCSD's motion for summary judgment.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**September 16, 2019**
**Charleston, South Carolina**